BANSEL v. ASHCROFT Good morning, Your Honor. Please support Martín Guajardo on behalf of Divinder Singh Bansel. I've listened to a number of my colleagues present their cases this morning, and we all seem to be focused pretty much on the same question, and that is credibility. I think our case now probably ratchets up a little bit the issue of credibility, because we know that Divinder Singh Bansel filed one application in 1995 that contained all false information. There wasn't anything that was true in that application. And the Immigration Service then proceeded to approve that application for asylum. What did he say in it that made it different from the others? I mean, it made it sort of expedited, even. What did he say that made the application expedited? Why would the agency — Why did he cut it so fast? That's a good question, because I think that what we've seen is, particularly now that the agency has changed its name, is that we've seen applications that were filed in the late 80s, early 90s finally being adjudicated by the agency. The agency's staff on these cases — So can you tell me concretely what did he — what particular facts he alleged that were different? Because I know he had a false name, but — And then he — his declaration to support the application, his affiliation was not with the All Indian Sikh Students Federation. It was with another organization. Was it a terrorist organization? Not — not that — I mean, was it a much more political organization? What was the difference? I don't — I don't — I don't know that the basis upon which that application, the application that he submitted in 1995, that it was moved along in an expedited fashion, because of what substantively was said in the application. I think what happened is that the procedure of the agency was, well, we have five years of boxes of asylum applications. Let's go ahead and call in the people that are submitting applications. Now let's give them an interview. So that, in a sense, is what happened with that 1995 application. But what we do know is that as a result of the application being granted, his wife and three kids, his two daughters and his son, all came to the United States. And then sometime in 1998, the agency determined that there was an application that had been submitted in 1991. And that application, then, was the application that he proceeded on before the immigration judge. So sometime in 1998, there's a charging document issued against him, a notice to appear, and he appears in front of Judge Laura Ramirez for the first time. And now the question that we're confronted with is, once you've lied to the department, can you really come back and wipe the slate clean? Can a judge sit there, listen to what you have to say, and believe anything to be true? Or are you, if you will, are you condemned to eternal damnation for having made that application? Aren't we one step removed from that? I mean, you can come back and perhaps persuade the immigration judge that you're credible. But if the immigration judge concludes that you're not credible, can we say that no reasonable fact finder could reach that conclusion in the face of admitted evidence that he turned an entirely fabricated application and presumably signed that under penalty of perjury, blah, blah, blah, all the fine print? After that point, can anybody second-guess an I.J.'s determination that credibility is lacking? I think in this particular case, I think we can. And what I'd like, I would ask the Court to look at the exhibits that the judge decided not to, if you will, give any evidentiary weight to. Well, that seems to be the question here, that the credibility finding then led to the I.J.'s discounting the documentary evidence or giving it very little weight. And I assume the basic part of your appeal is that we should consider the documentary evidence and not ignore it because of the credibility finding, but see whether the documentary evidence supports the statements that otherwise would be discounted. And I think in this instance, there was an opportunity for the Court and there was an opportunity for the agency through its representative to have taken those steps, if you will, ameliorative steps, at least, to try to help the Court to be able to say that hearing, the hearing was continued in June up to January for about six months. And at that point, there were, all the evidence was in. The judge asked Mr. Evan Franke, the attorney for the agency, are you going to conduct an overseas investigation? Mr. Franke, at page 69 of the transcripts, indicates to Judge Ramirez, I don't think in this case I would necessarily seek an overseas investigation. And seven months would pass before Judge Ramirez would see this case again. And I think there was an opportunity for the Court to have an investigation and to ask the Court why didn't the agency, if they were troubled with any of the documents, if they were troubled with the marriage certificate, why wouldn't the agency follow up on it, if there was verification that DeVinder in fact had been a member of the organization for more than 20 years, there was no investigation there. Nothing was done despite the fact that the application that was approved in 1995 had contained these false statements. I think that there's a lot of time spent in the hearing with regard to the arrest in 1997. And it's troublesome because we know from the information on the record now that they initially charged DeVinder with a 273 offense under the California Penal Code for the cruelty to a child, and then ultimately it's disposed of as a misdemeanor with a fine, probation for one year. And it's interesting that, again, the attorney for the agency points out to the judge. He says to her, with regard to the arrest, at page 91, he indicates he seems, referring to DeVinder Singh Bansal, he seems particularly unclear on what happened and the results. Again, we find that Judge Ramirez takes the testimony about the arrest and simply says, you're not being truthful even now. You're not you weren't telling me the truth. And then the information with regard to what activities and what he did in India before he came over to the United States and the four arrests or the three arrests that were listed in the 1991 declaration. Again, the judge looks at the various exhibits that are provided, and I believe she goes through a half a dozen exhibits and simply says, I'm not going to give much weight to these. I think that under the circumstances, I think it was Judge Clifton had asked the question earlier, and that is, can we still find today that he has provided, he has presented credible testimony, and despite the fact that he has misrepresented himself in that 1995 application, I think we can. I think that the record, the record shows that when that third application is submitted to the immigration judge, it has the same declaration that was presented in 1991, almost 12 years earlier. It's not a different application. It's the same application. Actually, it confused me for a second. The third application I thought actually was the first application just come back to life because the 1995 application, which had been granted, was then thrown out as being fraudulent. It should have been that way, Your Honor. But I think what the record is going to show is that, or what the record does show, is that the attorney that represented him before Judge Ramirez filed in 1998, and I believe that's A new set of papers? A new set, a new form, if you will, supported with a typewritten duplicate of the declaration that was submitted in 1991. When we look at some of the other material that the judge gave no weight to, how is it that we can give no weight to the death certificates? This applicant, Devinder Singh Bansal, provides the death certificates of both of his brothers, one that was killed here in the United States, the other one that died in India. And we have Judge Ramirez finding that she will give no evidentiary weight to even the death certificates. Well, it seems at that point that if the judge, who essentially was going to, was hearing his case now being presented with this same application in 1991, if she's unwilling to provide any evidentiary weight to a half a dozen documents that either support the fact that he was part of the organization, the warrant of arrest that was provided, the marriage certificate for him, the death certificates of both of his brothers, even the birth certificates of his children, if none of that material is going to make any difference to the judge, it seems to me that there is absolutely no way to have a clean slate for him when he goes in front of the judge. It doesn't matter what he says. The answer is going to have to be no. And I don't... Unless the immigration judge believes him, which he would be free to do. These documents, I understand the significance of the documents, but are they in the end sponsored by anything other than ultimately his testimony as to their authenticity? I think the documents that are with regard to birth and deaths, I mean, those documents, we have to give them full evidentiary weight unless... Why? Because... You can get a birth certificate printed up. You can get a birth certificate issued in somebody else's name. How is the immigration judge to have confidence that the documents are what they profess to be? The death certificate for Ranbir is issued out of Yolo County. And for the judge to say, I'm not going to give any evidentiary weight for the death certificate out of Yolo County, how can we agree that that's okay? That's not okay. I mean, we can raise questions as to documents that were provided, possibly everything else from India. But what about that document? Does that now taint and does that give some plausible explanation as to why this case was denied and why there isn't anything that he can say that will make it okay now? Thank you, Your Honor. Thank you, counsel. Good morning, Your Honor's counsel. I'm still Margaret K. Taylor, representing the government in this matter. I'm surprised. It's been a long time. Yes, it has. Really, we can't get over the fact in this case that Mr. Singh Bansal has, under oath, has submitted a fraudulent asylum application. But did the I.J. I mean, I think the I.J. may have been within her rights to say, I'm not going to believe a word you say anymore. But as I read her decision, I don't really find her saying that. Well, that's a very interesting dimension of her decision because there is that white, the slate clean language. But as I looked at that over and over again, I think what she was saying was, I'm giving you, I gave you an opportunity to overcome this. But you didn't. And that, in the end, she still took into account and had every right to take into account all the fraudulent application, the fraud in front of the asylum officer, the fraudulent birth certificate that accompanied the fraudulent I-589. I don't think at any point did she say, okay, now I'm putting on blinders and saying, oh, I forgot there's been a fraud. What she said was, I gave you an opportunity, which actually, you know, was very generous of her, to wipe the slate clean. But all these inconsistencies and problems with your case, you know, you just didn't overcome the sort of chips against you when you first presented yourself with all this history of fraud. Do we have any case that directly addresses that problem? Actually, I found one, not in the Ninth Circuit. But there is one in the First Circuit that is exactly on point. And I do need to 28J it because, again, I didn't find it seven days ahead of time. Well, that would be good. The name of the case, and I will 28J it also, is Lorenz v. Ashcroft, and it's found at 359 F. 3rd 59. And in that case, very similar to this one, there had been an admission under oath of a fraudulent asylum application with a subsequent alleged truthful asylum application. It went to hearing before an IJ, the immigration judge, excuse me. And the immigration judge considered both the adverse, the inconsistent testimony during that hearing and the fraudulent asylum application. And there's actually some really good language in it. The Court held both. There's a footnote that says the mere fact that a judge forms a preliminary opinion about the facts, you know, And then also, in evaluating the petitioner's credibility, the IJ found that her admittedly fraudulent original application, much like this one, coupled with her rehearsed and equally false testimony at her initial asylum interview, like this one, fairly illustrated her propensity to dissemble under oath. And then found that this propensity really continued through the subsequent consideration of the subsequent asylum application. So I will forward that to opposing counsel and to Your Honor. So that would be good. I wanted to ask you about another case that I don't think is cited by either side. I hope I know it. It's KML. I'm somewhat familiar with that decision, Your Honor. All right. And that's where we remanded on the Convention Against Torture issue. That's right. For failure to consider country conditions.  I'm sorry, Your Honor. In this case, the judge found Mr. Singh-Bansal incredible as to everything, including torture, persecution, both. So it seems to me if the court upholds the adverse credibility finding, there's no need to send it back for consideration of country conditions. Well, it's a — as I have the summary of KML here, the court says the agency plainly overrelied on its prior adverse credibility finding. Well, as I — It has to consider country conditions. As — So we know — I mean, as I said earlier, I've had a number of these cases involving Sikhs. We know the government of India is quite savage in repressing the rebellion in Punjab. And I think those conditions are terrible. So shouldn't they be taken into account? Well, Your Honor, as I recall, Kamalthus — and this is not something I prepared for this argument. No. In that case, the immigration judge limited his adverse credibility finding to the persecution claim and did not really address it in the context of country conditions for the CAC claim separately. And so that's why it was sent back. But I would be happy to take another look at Kamalthus and brief it for the court later. You know about Kamalthus. You have argued it before, then. I have. I have dealt with Kamalthus before. Yes, Your Honor. And is there a separate finding here on the CAC claim on the — Yes, there is, Your Honor. All right. It's at the very end of the immigration judge's decision. So I'll point you to it. All right. Page AR70. Withholding or removal under the Convention Against Torture through 71. That's the separate holding on the CAC claim. And the immigration judge does analyze, citing to a matter of YB, that the evidence is also insufficient to demonstrate torture. And so — But isn't that exactly relying on the earlier findings? They were the same reasons. Well, I — again, I would really need to research this. But is there any reference to the country condition? It seems to me it doesn't exactly come out that he relies on what he found on the other and doesn't refer to the country. If you look to the — to page 71, there is a reference to Department of State report, although I have to say the reference is not entirely clear, but it is at least referenced here. There is a reference.  I don't think it's terribly reassuring to say that law enforcement routinely abuses detainees regardless of religion. Well, the point is, Your Honor, that this particular alien has such a propensity for lying that he hasn't shown whether there's persecution or torture or whether he's been arrested seven times or two times or no times. I think the problem — the difference with Camalthus is that they said after that that remand is not necessary when a Petitioner's claim under CAT is based on the same testimony that the BIA found incredible, particularly when the Petitioner points to no new evidence that the BIA should have considered making its CAT determination. That's Taha v. Ashcroft in 2004. I think what Camalthus is saying is if the determination of lack of credibility relates only to the matters raised in connection with asylum, then you have to make a separate investigation with the CAT claim. I agree with you, Your Honor. But here, I think the testimony on which the CAT claim depends is the same. Yes, I agree with you, Your Honor. But I'm not sure how all that works out. But it sounds like — I mean, we distinguish Camalthus and Taha on the basis that it was the same thing. Is there a difference in the basis for the CAT claim in this case? No. No. It's the same set of facts, the same adverse credibility finding for both of us. I mean, it wouldn't be enough to make a CAT claim to show there were general — general unsatisfactory conditions. Yes, I agree with that statement of law, Your Honor. Well, my time is up. In summary, what we have — Let me ask you — Yes, of course. Is the failure of the IJA to consider the immigration judge — to consider the documentary evidence or his refusal to give it weight, is it all evidence that depends on the credibility of the applicant? Or is some of the documentary evidence independently substantiated? Well, let me give you an example of one of the documents that was rejected, and that's the passport. The passport — there was also some testimony about the passport. Because, as you may recall, Mr. Singh Bansal went to the United Arab Emirates to pick up his passport at first, and there was some question about why he did that and when he did that. And at first, he testified that he had never left India. Then when he was presented with the passport, he said, oh, yeah, yeah. In 1990, I went to pick up my passport. I had to flee — he testified, in 1990, I had to flee from India because I was being persecuted. And then while I was in the UAE, I picked up my passport. And then he also said that he just left India to the UAE to pick up his passport. As it turns out, he had been to the UAE in 1985, previously when the passport was issued. So he left India twice. We're not clear whether he left India just, you know, to take care of his passport, or he also testified another time that he was leaving because he was fleeing persecution. And there's another problem with his testimony, too, because he went to the UAE before 1990, the 1990 alleged first arrest and imprisonment, and he said that he had never had any trouble before then. So, for example, that's a document in the record that was rejected, the passport, because, of course, the testimony surrounding it is all over the place. And I think that's pretty exemplary of all the testimony that Mr. Singh Bansal offered. And so the IJA's adverse credibility finding is certainly supported by substantial evidence, and no other conclusion is compelled. Thank you. Thank you. Do you have anything further? If I may, just for one moment. With regard to the passport, Your Honor, I think that that is a continuing issue for us in terms of what the judge is willing to accept. Because if we look at page one of the administrative record at page 180, I'm sorry, the judge indicates that she indicates similarly, this is in denying the voluntary departure, she indicates similarly he has not presented a travel document. And Exhibit 15, she accepts it because she indicates in Exhibit 15 is the photocopy of that passport, and she accepts it because she says there was no objection. We have an individual who's had the passport for 15 years. He has a photocopy of it, and it was renewed in Abu Dhabi in June, which was one of the issues that was raised as well as to whether why he was in Abu Dhabi and so forth. But at the end, when she is looking at the issue of voluntary departure, she finds he has no travel document. There's testimony in the record that that passport was lost, but we know that that passport has been around for the last 15 years. It seems to be inconsistent with wiping the slate clean. But is there a legal obligation to wipe the slate clean? I think the yes from our – there's no question that we cannot condone individuals making false applications to the agency in order to gain their benefits. That's without question. However, if someone has testified that they have been tortured, if someone can set forth their story, then we have an obligation not to return them to their country. And I think that here, if there's – if the judge has taken that evidence that was presented to her and has given it no weight, she has not wiped the slate clean. Thank you. Thank you, counsel. The case that's argued will be submitted. Are we going to do the telephone argument from here? No, let's take a five-minute break. But we're going to do it out in the courtroom? Yes. Okay. Thank you. All rise. This court will stand at recess for approximately five minutes. The last case on the calendar will be testifying. Mr. Bradford.
judges: Reinhardt, Noonan, Clifton